*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DEMETRIUS CHAPEL,

        Defendant-Appellant.

UNPUBLISHED
April 8, 2021

No. 348244
Wayne Circuit Court
LC No. 18-004779-01-FC

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

EMANUEL LONG,

        Defendant-Appellant.

No. 349245
Wayne Circuit Court
LC No. 18-004780-01-FC

Before: TUKEL, P.J., and JANSEN and CAMERON, JJ.

PER CURIAM.

Defendants Demetrius Chapel and Emanuel Long, at a joint trial before the same jury, were each convicted of first-degree premeditated murder, MCL 750.316(1)(a), conspiracy to commit first-degree murder, MCL 750.157a and MCL 750.316(1)(a), discharge of a firearm from a vehicle causing death, MCL 750.234a(1)(d), discharge of a firearm at a building causing death, MCL 750.234b(5), two counts of assault with intent to commit murder, MCL 750.83, discharge of a firearm at an occupied building, MCL 750.234b(1), and seven counts of possession of a firearm during the commission of a felony, MCL 750.227b. The trial court sentenced each defendant to life imprisonment without parole for the first-degree murder and conspiracy to commit murder convictions, to 20 to 40 years' imprisonment for the assault with intent to commit murder and discharge of a firearm causing death convictions, and to 5 to 10 years' imprisonment for the

-1-

discharge of a firearm at an occupied building conviction. Defendants were also sentenced to two years' imprisonment each for the felony-firearm convictions, which were to be served consecutively to the other sentences.

With respect to Docket No. 348244, we remand to the trial court for proceedings consistent with this opinion. We do not retain jurisdiction. With respect to Docket No. 349245, we affirm.

## I. BACKGROUND

Defendants' convictions arise from multiple shootings that occurred on November 30, 2017, in Detroit. In the hours before the the shootings occurred, several individuals had gathered at a home on Nashville Street. Antonio Henley was one of those individuals. At some point, Henley walked to liquor store that was on the corner of Nashville Street and Gunston Street. Markise Wright, who lived on Gunston Street, was in the liquor store parking lot in a silver car when Henley arrived. Wright was affiliated with a gang or group that was in a rivalry with Block Squad, and Henley's brother was affiliated with Block Squad. Wright exchanged hostile looks with Henley, and they began to argue. According to Henley, Wright was "irate" and displayed a pistol. Henley proceeded back to the home on Nashville Street, and Wright followed him in the silver car. Wright drove past the home several times, which frightened the individuals who were present. Henley left the premises.

At 7:01 p.m., Wright began calling Long to inform him that Henley was in the neighborhood. Long was at an Applebee's restaurant in Roseville when he spoke to Wright. At 7:22 p.m., Long was seen leaving the Applebee's restaurant. Long got into in a black Buick and drove away. Cell phones associated with Long and Chapel communicated multiple times between 7:37 p.m. and 7:41 p.m. At 7:45 p.m., the phone associated with Chapel left the area of Grayton Street and stopped at LaSalle College Park, which is close to Nashville Street. Shortly before 8:00 p.m., both cell phones were utilizing cellular towers in Detroit that were in similar sectors and were in the area of the crime scene. At approximately 8:33 p.m., a black Buick pulled up to the Nashville Street home. Two of the Buick's windows rolled down, and shots were fired from the vehicle.

One individual was killed and several other individuals were wounded in the shootings. Wright and Long were identified as suspects and they were arrested in December 2017. On January 8, 2018, Chapel was interviewed by law enforcement concerning a homicide that is unrelated to this case. Chapel, who was on probation at the time of the interview, was not arrested. However, before the interview, Chapel's personal belongings were removed from his person. Chapel's personal belongings were returned to him at the conclusion of the interview, with the exception of his cell phone. On January 9, 2018, a search warrant was issued permitting law enforcement to extract the data from the cell phone. During law enforcement's analysis of that data, it was discovered that the cell phone was in the area of the shootings on the evening of November 30, 2017. Chapel was later arrested.

As part of a plea agreement, Wright testified for the prosecution at Long and Chapel's joint trial.[1]  The jury found both defendants guilty of the crimes referenced above, and defendants were sentenced as described above.[2]  These appeals followed.

## II.  CHAPEL'S ARGUMENTS ON APPEAL (DOCKET NO. 348244)

### A.  SEIZURE OF CHAPEL'S CELL PHONE

Chapel argues that the trial court erred by denying his motion to suppress evidence concerning the data that was extracted from his cell phone and presented as evidence at trial.

### 1.  PRESERVATION AND STANDARDS OF REVIEW

"We review issues of constitutional law de novo."  *People v Benton*, 294 Mich App 191, 203; 817 NW2d 599 (2011).  Additionally,

> [t]his Court reviews for clear error a trial court's factual findings in a ruling on a motion to suppress evidence.  A trial court's factual findings are clearly erroneous when this Court is left with a definite and firm conviction that the trial court made a mistake.  The decision whether to admit evidence is within a trial court's discretion . . . .  A trial court abuses its discretion when it selects an outcome that falls outside the range of reasonable and principled outcomes.  To the extent that a trial court's ruling on a motion to suppress involves an interpretation of the law or the application of a constitutional standard to uncontested facts, our review is de novo.  [*People v Clark*, 330 Mich App 392, 415; 948 NW2d 604 (2019) (quotation marks and citations omitted).]

### 2.  RELEVANT AUTHORITY AND ANALYSIS

"The Fourth Amendment of the United States Constitution and its counterpart in the Michigan Constitution guarantee the right of persons to be secure against unreasonable searches and seizures."  *People v Kazmierczak*, 461 Mich 411, 417; 605 NW2d 667 (2000).  The basic purpose of the Fourth Amendment "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials."  *Carpenter v United States*, ___ US ___, ___; 138 S Ct 2206, 2213; 201 L Ed 2d 507 (2018) (quotation marks and citation omitted).

---

[1] Wright pleaded guilty to commission of a felony by a gang member, MCL 750.411u, and discharge of a firearm from a vehicle causing death.  Wright was sentenced to 5 to 20 years' imprisonment for each conviction.

[2] Along with the crimes referenced above, defendants were also each charged with two additional counts of assault with intent to murder, two additional counts of felony firearm, and one count of commission of a felony by a gang member.  At the close of the prosecutor's proofs, defendants both moved for directed verdict.  Two counts of assault with intent to murder were dismissed, as were the accompanying felony-firearm charges.  The gang charges were also dismissed after the prosecutor conceded that sufficient evidence had not been presented.

As relevant to this appeal, "a seizure of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *People v Woodard*, 321 Mich App 377, 383; 909 NW2d 299 (2017) (quotation marks, citation, and alteration omitted). "Whether a search or a seizure is lawful depends on whether it is reasonable. Therefore, a search for purposes of the Fourth Amendment occurs when the government intrudes on an individual's reasonable, or justifiable, expectation of privacy." *People v Mahdi*, 317 Mich App 446, 457-458; 894 NW2d 732 (2016) (quotation marks and citations omitted). The Fourth Amendment protection against unreasonable searches and seizures applies to cell-phone data. *People v Hughes*, ___ Mich ___, ___; ___ NW2d ___ (2020) (Docket No. 158652). "A warrantless search and seizure is per se unreasonable[.]" *People v Roberts*, 292 Mich App 492, 503; 808 NW2d 290 (2011) (quotation marks and citation omitted). However, "[t]he right to be secure against unreasonable searches and seizures absent a warrant based upon probable cause is subject to several specifically established and well-delineated exceptions." *Kazmierczak*, 461 Mich at 417.

In this case, Chapel does not contend that law enforcement's search of the contents of his cell phone pursuant to the search warrant was unlawful. Rather, Chapel argues that the initial seizure of the phone was unlawful. It is undisputed that the police did not obtain a warrant for the initial seizure of the phone. Thus, the threshold issue on appeal is limited to whether the police's seizure of the cell phone qualified under one of the exceptions to the warrant requirement.

As already stated, Chapel was interviewed concerning a homicide unrelated to this case that occurred on December 13, 2017, in Detroit. The victim in that case was shot in the course of a robbery and died a short period of time later. Two witnesses who were with the victim before he was killed identified Devontae Perry as the man who approached the victim. The witnesses indicated that Perry pointed a gun at the victim and said "you know what time it is." However, because the witnesses fled on foot before the shooting occurred, they did not see Perry shoot the victim. Perry was arrested and interrogated. Perry indicated that a man nicknamed "Meech" was the shooter, and that he had provided the gun for the homicide. Perry provided law enforcement with Meech's Facebook information, and further investigation revealed that the account was associated with Chapel.

According to Chapel, on January 8, 2018, police officers arrived at his home "and took him to his probation officer's office." Although it appears to be undisputed that Chapel was informed that he was not under arrest, law enforcement officers confiscated Chapel's personal property, which included a cell phone. Chapel was questioned about the unrelated homicide. According to Chapel, he did not "know anything about the homicide." When the interview concluded, Chapel was taken from the probation department to the homicide department. Chapel was eventually permitted to leave and, with the exception of the cell phone, his property was returned.

Law enforcement sought a search warrant to obtain the data contained on Chapel's cell phone. The affidavit supporting the search warrant outlined law enforcement's investigation of the unrelated homicide, including the information provided by Perry and Chapel's association with the Facebook account identified by Perry. The affidavit provided, in relevant part, as follows:

> On January 8, 2018, . . . Chapel . . . was interrogated. Mr. Chapel had an Alcatel cell phone on [sic] his possession and stated he has had the cellphone for "sometime". Mr. Chapel denied being at the homicide scene and any involvement

in the homicide. Mr. Chapel refused consent to forensically dump his cell phone. [The affiant] recovered his cellular phone and placed on evidence tag .42.

Affiant has probable cause to believe there is evidence inside of the listed electronic device(s) in relation to the fatal shooting of the [homicide victim].

On January 9, 2018, law enforcement obtained the search warrant. After the "forensic dump" of Chapel's cell phone was complete, law enforcement located evidence concerning Chapel's "whereabouts on the date of November 30th at about 8:30 in the p.m."[3] Specifically, Sarah Markel accessed the Google Maps app on Chapel's phone and was able to determine that he was in the area of the shootings on the evening of November 30, 2017. Markel also determined that Internet searches related to the November 30, 2017 shootings had been conducted on the phone. Markel also located a photograph of Chapel and Long on Chapel's cell phone. The photograph was sent to Chapel by Long in a text message. In the photograph, Chapel is holding a firearm.

Chapel argued before the trial court that Markel's testimony concerning the data that she analyzed from Chapel's cell phone should be precluded. The prosecutor objected, arguing that the phone was properly seized because probable cause existed to support that Chapel was involved in the unrelated homicide and because the facts were akin to a search incident to arrest. The prosecutor also emphasized that a search warrant to extract the data was obtained before the search occurred. The trial court ultimately denied the motion. In doing so, the trial court relied on *United States v Gholston*, 993 F Supp 2d 704 (ED Mich, 2014). Chapel argues that the trial court's decision was in error, and we agree.

As an initial matter, we note that the record does not indicate that Chapel made a pretrial motion to suppress the cell-phone data as illegally seized evidence. "It is a general rule that any motion to suppress evidence must be made before trial if the defense counsel is aware of the evidence at that time." *People v Character*, 32 Mich App 40, 43; 188 NW2d 12 (1971). "The orderly conduct of a trial necessitates that such motions and the resultant hearing be disposed of before trial." *Id.*

In this case, defense counsel waited until the fourth day of trial to verbally move the trial court to suppress evidence concerning the data that was obtained from Chapel's cell phone. The prosecutor noted on the record that the motion took him by surprise, that the seizure issue should have been resolved before trial, and that the member of law enforcement who could provide specific details about the seizure was not available to answer questions because the prosecutor did not know that "this was going to be a motion up today." When questioned about the lateness of the motion, defense counsel indicated that he had only learned of the contents of the search warrant affidavit the day before. Although the prosecutor was not certain that a copy of the warrant had

_____

[3] It is unclear if Chapel was charged with any crimes associated with the unrelated homicide.

been provided during discovery,[4] defense counsel should have been aware long before trial that Chapel's cell-phone data had been searched. Had defense counsel filed a proper pretrial motion or provided the prosecutor with notice of his intent to move the trial court to preclude Markel's testimony, an evidentiary hearing could have been held to inquire into the details of the seizure. Unfortunately, this did not occur. As a result, we are left with limited details concerning the seizure of the phone.

Despite the limited record, the trial court essentially concluded that a Fourth Amendment violation did not occur when Chapel's cell phone was seized because the facts in this case are akin to a search incident to arrest. A police officer may perform a warrantless search of an individual incident to a lawful custodial arrest. *United States v Robinson*, 414 US 218, 235; 94 S Ct 467; 38 L Ed 2d 427 (1973) ("It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment."). Such a search is justified by "the need to disarm the suspect in order to take him into custody" and the "need to preserve evidence on his person for later use at trial." *Id*. at 234.

The trial court relied on *United States v Gholston* when denying Chapel's motion to suppress. In that case, the police arrested the defendant for his alleged involvement in a robbery. *Gholston*, 993 F Supp 2d at 707. The defendant's cell phone, which was on his person, was seized at the time of his arrest and was not returned to him when he was released on February 25, 2013, following "a detention hearing[.]" *Id*. On March 4, 2013, the police obtained a search warrant to search the contents of the phone, and incriminating evidence was discovered during the search. *Id*. at 708. The defendant sought to suppress the evidence that was obtained during the search of his cell phone. *Id*. The defendant acknowledged that the arresting officers had authority to conduct a search incident to his arrest, but he argued

> that the seizure and subsequent search of his cell phone were unlawful because (i) at the time of his arrest, it would not have been immediately apparent to the arresting officers that the cell phone would contain incriminating evidence subject to seizure, and (ii) nothing in the ensuing investigation or in the search warrant application prepared by [law enforcement] bridged this gap and provided probable cause to believe that this device would contain evidence of the robbery offense under investigation. [*Id*. at 708-709.]

---

[4] The prosecutor stated as follows:

> Your Honor, I was not originally on this case so I don't know what was in the original discovery packet. I know search warrants was [sic] provided to defense counsel. I don't know if that one was so I'm not going to speak on that. I believe they all were. But I did send him a copy of the search warrant yesterday when he asked for it.

The *Gholston* court concluded that, even if the defendant was "correct that the initial seizure of his cell phone at the time of his arrest was unlawful, he has failed to suggest a reason why the exclusion of evidence found in a subsequent search of this device pursuant to a warrant would be a proper remedy for any such transgression." *Id*. at 715. The court concluded that the officer followed the correct course by seizing the phone incident to the defendant's arrest and by refraining from searching the phone until he obtained the warrant. *Id*. at 716. The *Gholston* court also stated that holding the defendant's cell phone for a few days after his release was only a "modest intrusion" that "did not implicate a more substantial privacy or liberty interest" and did not "warrant the last resort of an exclusionary remedy . . . ." *Id*. (quotation marks and citations omitted).

In this case, unlike in *Gholston*, it does not appear that Chapel's phone was seized following a search incident to a lawful arrest. Indeed, Chapel's counsel indicated on the record that Chapel was informed that he was not under arrest when he was brought in for questioning and that his property, with the exception of his cell phone, was returned to him after the interview. Although the trial court appears to have concluded that the taking of Chapel's cell phone before the interview was justified because it was sufficiently similar to a search incident to arrest, we are not convinced of the similarity. There may be legitimate security concerns related to a probationer's possession of a cell phone when meeting with a law enforcement officer, but these concerns are resolved when the probationer departs. Additionally, any security concerns during the interview do not explain why the cell phone was not returned to Chapel. Furthermore, while the record supports that Chapel was on probation at the time of the seizure, we cannot examine Chapel's probation conditions because they are not contained in the record and were not referenced on the record. "Without the probation conditions, there is insufficient evidence in the record to conclude that the officers had reasonable suspicion that" Chapel, as "a probationer subject to a search condition was engaged in criminal activity." See *Mahdi*, 317 Mich App at 466 (emphasis omitted). Cf. *United States v Knights*, 534 US 112, 118; 122 S Ct 587; 151 L Ed 2d 497 (2001) (concluding that a search of a probationer was reasonable under the totality of the circumstances and that "the probation search condition" was a "salient circumstance").

Additionally, the evidence does not support that the officers were entitled to seize the cell phone under the plain-view exception to the warrant requirement. Specifically, there is no indication that the police seized Chapel's cell phone because the incriminating nature of the phone was immediately apparent when they first encountered Chapel or that the incriminating nature of the phone became apparent during the course of the interview. See *Mahdi*, 317 Mich App at 462. Indeed, the limited record before us establishes that Chapel was questioned about a homicide that is unrelated to this case. Although Perry implicated Chapel in the unrelated homicide, there is no indication that Perry indicated that Chapel had used his cell phone at any relevant time. Rather, it appears that further investigation was necessary to establish a connection between the cell phone and the suspected criminal activity. Specifically, cell-phone data had to be extracted and analyzed.

Although the prosecutor argues that the police had concerns that Chapel would have destroyed or discarded the phone if had not been seized, there is no record evidence to support this assertion. The affidavit supports that Chapel refused to consent to a search of his cell-phone data. While this refusal could support that Chapel knew that the phone contained incriminating evidence, a mere possibility that evidence might be destroyed is insufficient in the absence of an objectively reasonable basis for concluding that such destruction is actually imminent and leaves no time to obtain a warrant. *People v Blasius*, 435 Mich 573, 594; 459 NW2d 906 (1990). Indeed,

"[t]o validate searches . . . on the basis of hypothetical possibilities of destruction or removal would essentially nullify Fourth Amendment protections." *Id*. Consequently, on this limited record, we cannot say that the warrantless seizure of the cell phone was lawful.

Moreover, even if we were to conclude that the seizure of the cell phone was lawful, our inquiry would not stop there given our Supreme Court's recent holding in *People v Hughes*. In *Hughes*, the defendant was under investigation for drug trafficking, and law enforcement successfully obtained a search warrant to search the defendant's cell phone for evidence relating to that crime. *Hughes*, ___ Mich at ___; slip op at 4-5. After the cell phone was seized, the defendant was charged with armed robbery. *Id*. at ___; slip op at 5. Thereafter, a forensic examination of the phone was performed, and all of its data was extracted. *Id*. at ___; slip op at 5. "A month or so after the initial extraction, at the request of the prosecutor in [the] defendant's armed-robbery case, [a detective] conducted further searches of the cell-phone data[.]" *Id*. at ___; slip op at 6. The searches uncovered evidence of the defendant's involvement in the armed-robbery case. *Id*. at ___; slip op at 6. The evidence was used at the defendant's armed-robbery trial, and he was ultimately convicted of armed robbery. *Id*. at ___; slip op at 7.

The defendant appealed, arguing that "the phone records should have been excluded from trial because the warrant supporting a search of the data only authorized a search for evidence of drug trafficking and not armed robbery[.]" *Hughes*, ___ Mich at ___; slip op at 7. Our Supreme Court agreed, concluding that the seizure and search of cell-phone data pursuant to a warrant does not extinguish the "otherwise reasonable expectation of privacy in the entirety of that seized data." *Id*. at ___; slip op at 13. Specifically, the *Hughes* Court held as follows:

> [T]he search and seizure of [the] defendant's cell-phone data pursuant to a warrant in the drug-trafficking case did not altogether eliminate his reasonable expectation of privacy in that data. Rather, the police were permitted to seize and search that data, but only to the extent authorized by the warrant. Any further review of the data beyond the scope of that warrant constitutes a search that is presumptively invalid under the Fourth Amendment, absent some exception to that amendment's warrant requirement. [*Id*. at ___; slip op at 21.]

The *Hughes* Court then considered "whether the review of [the] defendant's data for evidence of an armed robbery fell within the scope of the warrant issued in the drug-trafficking case." *Hughes*, ___ Mich at ___; slip op at 21. The Court held that a search of cell-phone data "must be reasonably directed at uncovering evidence of the criminal activity alleged in the warrant and that any search that is not so directed but is directed instead toward finding evidence of *other* and *unrelated* criminal activity is beyond the scope of the warrant." *Id*. at ___; slip op at 22 (quotation marks and citation omitted). The Court acknowledged that "criminal suspect[s] will not always store or organize incriminating information on his or her digital devices in the most obvious way or in a manner that facilitates the location of that information." *Id*. at ___; slip op at 24-25. Nonetheless, the Court declined "to adopt a rule that it is always reasonable for an officer to review the entirety of the digital data seized pursuant to a warrant on the basis of the mere

possibility that evidence may conceivably be found anywhere on the device or that evidence might be concealed, mislabeled, or manipulated." *Id*. at ___; slip op at 25. The Court held that,

> [s]uch a per se rule would effectively nullify the particularity requirement of the Fourth Amendment in the context of cell-phone data and rehabilitate an impermissible *general warran*t that would in effect give police officers unbridled discretion to rummage at will among a person's private effects.

> *   *   *

> [A]n officer's search of seized digital data, as with any other search conducted pursuant to a warrant, must be reasonably directed at finding evidence of the criminal activity identified within the warrant.

> Specifically in the digital context, this requires that courts and officers consider whether the forensic steps of the search process were reasonably directed at uncovering the evidence specified in the search warrant. Whether a search of seized digital data that uncovers evidence of criminal activity not identified in the warrant was reasonably directed at finding evidence relating to the criminal activity alleged in the warrant turns on a number of considerations, including: (a) the nature of the criminal activity alleged and the type of digital data likely to contain evidence relevant to the alleged activity; (b) the evidence provided in the warrant affidavit for establishing probable cause that the alleged criminal acts have occurred; (c) whether nonresponsive files are segregated from responsive files on the device; (d) the timing of the search in relation to the issuance of the warrant and the trial for the alleged criminal acts; (e) the technology available to allow officers to sort data likely to contain evidence related to the criminal activity alleged in the warrant from data not likely to contain such evidence without viewing the contents of the unresponsive data and the limitations of this technology; (f) the nature of the digital device being searched; (g) the type and breadth of the search protocol employed; (h) whether there are any indications that the data has been concealed, mislabeled, or manipulated to hide evidence relevant to the criminal activity alleged in the warrant, such as when metadata is deleted or when data is encrypted; and (i) whether, after reviewing a certain number of a particular type of data, it becomes clear that certain types of files are not likely to contain evidence related to the criminal activity alleged in the warrant.

> *   *   *

> The fact that some data reviewed turns out to be related to criminal activity not alleged in the authorizing warrant does not render that search per se outside the scope of the warrant. So long as it is reasonable under all of the circumstances for officers to believe that a particular piece of data will contain evidence relating to the criminal activity identified in the warrant, officers may review that data, even if that data ultimately provides evidence of criminal activity not identified in the warrant. [*Hughes*, ___ Mich at ___; slip op at 25-30 (footnotes, quotation marks, and citations omitted).]

The *Hughes* Court concluded that the second search of the defendant's phone "constituted a warrantless search that was unlawful under the Fourth Amendment" because the "review was directed exclusively toward finding evidence related to the armed-robbery charge, and it was grounded in information obtained during investigation into *that* crime." *Id*. at ___; slip op at 34.

In this case, the warrant authorized officers to search Chapel's cell phone, including "the entire contents" of the phone. The warrant also authorized officers "to seize, secure, tabulate and make return according to law the following property and things: All electronic data contained within the electronic device." This included "all phone numbers, contact information, phone information, text messages, email messages, photos, videos, and any other data contained within the listed device[.]" Although the warrant was broad, the affidavit did not mention the crimes at issue in this case, let alone seek to establish probable cause that Chapel committed them. Consequently, the warrant did not authorize a search of Chapel's data for evidence related to the crimes at issue in this case. See *Hughes*, ___ Mich at ___; slip op at 31.

As already stated, the unrelated homicide occurred on December 13, 2017, while the crimes at issue in this case occurred on November 30, 2017. There is nothing in the warrant or affidavit that would suggest that reviewing data concerning the movements of Chapel's cell phone on November 30, 2017, would uncover evidence concerning the unrelated homicide. To the extent that Markel was reviewing the cell-phone data for evidence of Chapel's involvement in the crimes at issue in this case, it is unclear why she was doing so. Indeed, there is no indication that another search warrant was obtained that authorized Markel to search for such evidence. The extent to which Chapel was even under investigation for the crimes at issue in this case at the time the data analysis was conducted is not apparent from the record. Although law enforcement was likely aware that Long and Chapel's phones had communicated before the shootings occurred, there is no indication that Chapel's phone records had been obtained at the time his phone was seized in relation to the unrelated homicide. Indeed, the warrant for the cell-phone records associated with Chapel's cell phone was not signed until January 9, 2018, which is the same day that the warrant for the data contained on Chapel's cell phone was signed.

It is also unclear whether Markel reviewed all of the data at once solely in relation to the unrelated homicide and, in doing so, happened to uncover evidence of Chapel's involvement in the crimes at issue in this case. Indeed, unlike in *Hughes*, the record does not specify that Markel was directed to conduct another search at the behest of the prosecutor in this case. There is also no indication that the evidence was located because Chapel hid or manipulated his files to conceal evidence related to the unrelated homicide. Indeed, Markel testified specifically how she located the Google Maps information. Markel testified as follows:

> There is an app on there [called] Google Maps. This is a common app that we use for getting directions, location information. So on this phone the location services was turned on.
>
> Under Google Maps is a section called Timeline. And in the Timeline we can go back and look at the Timeline and look at a specific date. And Google Maps timeline and through the history will show us every place that we were at on any particular day that it records that information.

So on this phone in order to access that I have to take it out of airplane mode, and then I can look at the Google map history. So I did that with this case [and] went to the timeline [that] went to November 30th, 2017 and looked at the locations that this phone traveled to.

This testimony suggests that Markel sought out evidence concerning these crimes—as opposed to locating the evidence by happenstance—while she was searching for evidence concerning the unrelated homicide. Because the record does not speak to whether Markel's search was designed to uncover evidence of criminal activity not identified in the warrant, we cannot conclude whether the search that uncovered the evidence pertaining to the crimes at issue in this case constituted a warrantless search that was unlawful under the Fourth Amendment.

Given the limited record in this case, we find it necessary to remand to the trial court for an evidentiary hearing concerning the circumstances surrounding the seizure of Chapel's cell phone and the circumstances surrounding Markel's search of the phone in relation to the crimes at issue in this case. At the conclusion of the hearing, the trial court must decide whether Chapel's cell phone was lawfully seized. The trial court must also decide whether Markel's review of the data was reasonably directed toward obtaining evidence of the unrelated homicide, or whether the search exceeded the scope of the warrant and constituted a warrantless search that was unlawful under the Fourth Amendment. If necessary, the trial court must also decide whether the exclusionary rule applies with respect to the cell-phone data and the cell-phone records associated with Chapel's phone.[5] Given our decision to remand, we need not consider Chapel's remaining arguments on appeal at this time.

### III. DOCKET NO. 349245 (DEFENDANT LONG)

### A. SUFFICIENCY OF THE EVIDENCE

Long argues that there was insufficient evidence to sustain his convictions. We disagree.

### 1. STANDARD OF REVIEW

"We review de novo a challenge on appeal to the sufficiency of the evidence." *People v Henry*, 315 Mich App 130, 135; 889 NW2d 1 (2016) (quotation marks and citation omitted). "To determine whether the prosecutor has presented sufficient evidence to sustain a conviction, we review the evidence in the light most favorable to the prosecutor and determine whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Smith-Anthony*,

---

[5] The prosecutor notes that Stan Brue testified as an expert in the forensic analysis of cell-phone records. Brue presented a chart depicting the phone calls between the phones associated with Chapel and Long in the hour before the shootings. Brue also presented a map, depicting the cellular sites and sectors that the phones associated with Chapel and Long were utilizing on the evening of November 30, 2017. The sites and sectors used in the periods before and after the shootings were consistent with use near the crime scene. According to the prosecutor, this evidence "was not based upon evidence obtained from the seizure" of Chapel's cell phone and therefore "would be unaffected, no matter the disposition of this issue on appeal."

494 Mich 669, 676; 837 NW2d 415 (2013) (quotation marks and citation omitted). "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Bailey*, 310 Mich App 703, 713; 873 NW2d 855 (2015) (quotation marks and citation omitted).

## 2. RELEVANT AUTHORITY AND ANALYSIS

Long argues that there was insufficient evidence of his identity as the perpetrator of the crimes. There is sufficient evidence for a guilty verdict where "a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Tennyson*, 487 Mich 730, 735; 790 NW2d 354 (2010) (citation omitted). "Circumstantial evidence and the reasonable inferences that arise from that evidence can constitute satisfactory proof of the elements of the crime." *People v Blevins*, 314 Mich App 339, 357; 886 NW2d 456 (2016). "[I]t does not matter that the evidence gives rise to multiple inferences or that an inference gives rise to further inferences[.]" *People v Walker*, 330 Mich App 378, 382; 948 NW2d 122 (2019) (quotation marks and citation omitted). "[I]t is well settled that identity is an element of every offense." *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008). A perpetrator's identity can be established by evidence that is "circumstantial and sometimes requires reliance on an inference founded on an inference . . . ." *People v Bass*, 317 Mich App 241, 264; 893 NW2d 140 (2016).

When viewing the evidence in the light most favorable to the prosecution, we conclude that sufficient evidence was presented for the jury to reasonably conclude that Long's identity was proven beyond a reasonable doubt with respect to the commission of these crimes. Testimony supported that, shortly before 7:00 p.m. on November 30, 2017, Wright and Henley had a confrontation in a parking lot because of a rivalry between Wright's gang and Block Squad. According to Henley, Wright became "irate" and showed a pistol to Henley. When Henley left the parking lot, Wright followed Henley to the Nashville Street home. Testimony supports that Wright continued to drive by the home, which frightened those who were present and caused Henley to leave the premises.

After 7:01 p.m., Wright called Long, whom he considered to be his cousin, multiple times. Wright acknowledged that he told Long about the encounter and where it had occurred. Long was at an Applebee's restaurant in Roseville when he spoke to Wright. At 7:22 p.m., Long was seen leaving the Applebee's restaurant. Long got into in a black Buick and drove away. The user of a cell phone associated with Long called a cell phone associated with Wright at 7:31 p.m. The user of that cell phone answered the call, and the call lasted for "just over five minutes." Cell-phone records establish that Long's phone was travelling away from Roseville during the phone call. At 7:53 p.m., the cell phone associated with Long utilized a tower in Detroit that was in the area of the crime scene. At 8:33 p.m., a black Buick drove up to the Nashville Street home where Henley had been seen earlier in the evening. Shots were fired from the vehicle, which then drove away from the scene. Although the phone associated with Long received several calls after 8:40 p.m., evidence supports that the phone was either "powered off" or "in some state where it was unable to receive service or have any contact with the network."

Wright, who was at his home on nearby Gunston Street, testified that he heard gunshots. Wright looked out the window and saw "police cars." At that point, Wright laughed, took a photo of the "police cars by the store," and text messaged the photo to Long. Wright also called Long,

who informed Wright that he would have to call Wright back. According to Wright, Long indicated that he "was in the hood" and that "[i]t was hot right now." A reasonable jury could find that Wright's laughter and his communications with Long after the shootings supported that Wright understood that Long had carried out the drive-by shootings. Indeed, Wright acknowledged that he had "bad intentions" when he called Long and asked Long to "shout at" Henley. Importantly, Wright testified that Long later apologized for getting Wright into a "predicament," which the jury could infer reflected Long's consciousness of guilt.

Analysis later revealed that some of the fired bullets that were located at the scene were .40 caliber Smith & Wesson. On December 5, 2017, law enforcement located a black Buick outside a home in Detroit. Long was outside, but when one of the officers asked to speak with him, Long went inside the home and did not initially answer the door despite officers repeatedly knocking. After about 20 to 30 minutes, Long exited the home and was arrested. Search warrants were obtained for the Buick and the home where Long was arrested. During a search of the Buick, a spent .40-caliber shell casing was found lodged in the vehicle's rear window. Additionally, two .40 caliber shell casings were found under a rear seat in the vehicle. A search of the home's attic uncovered a .40-caliber magazine. Therefore, the physical evidence supported that Long had access to the type of ammunition that was used in the shootings.

This Court has held that the prosecution is permitted to prove identity by evidence that is entirely "circumstantial and sometimes requires reliance on an inference founded on an inference . . . ." *Bass*, 317 Mich App at 264. We conclude that, when viewing all of the evidence in a light most favorable to the prosecution, the jury could have reasonably concluded beyond a reasonable doubt that Long committed these crimes.[6]

## B. ADMISSION OF EVIDENCE

Long argues that the trial court erred by permitting Detective-Sergeant Dean Molnar to testify that a firearm depicted in a photograph of Long and Chapel was consistent with the bullet fragment evidence recovered at the crime scene. Long argues that this testimony and the photograph should have been excluded under MRE 403 because any probative value of the evidence was outweighed by its prejudicial effect.

### 1. STANDARDS OF REVIEW

"When the issue is preserved, we review a trial court's decision to admit evidence for an abuse of discretion, but review de novo preliminary questions of law, such as whether a rule of evidence precludes admissibility." *People v Chelmicki*, 305 Mich App 58, 62; 850 NW2d 612 (2014). "An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes." *People v Buie*, 491 Mich 294, 320; 817 NW2d 33 (2012). "[W]hen . . . preliminary questions of law are at issue, it must be borne in mind that it is an abuse

---

[6] In reaching this conclusion, we did not consider any of the data the was extracted from Chapel's cell phone.

of discretion to admit evidence that is inadmissible as a matter of law." *Henry*, 315 Mich App at 143 (citation omitted).

## 2. ANALYSIS

At trial, Detective-Sergeant Molnar testified concerning a firearm that was depicted in a photograph of Long and Chapel. In the photograph, Chapel is holding a firearm. Detective-Sergeant Molnar was unable to specifically determine the caliber of the weapon, but he narrowed it down to three calibers, including a "9 mm Luger, a .40 caliber Smith & Wesson, or a possible .45 auto." Detective-Sergeant Molnar testified that this was consistent with some of the bullet-fragment evidence recovered from the crime scene.

As an initial matter, we note that the photograph was located after Markel searched the data contained on Chapel's cell phone. For the reasons already discussed, the issue of whether this search was lawful has not yet been resolved. While it is unlikely that Long would have standing to challenge the search of Chapel's cell-phone data,[7] we conclude that any constitutional error in admitting the photograph would be harmless. An error is not harmless if it affirmatively appears that "it is more probable than not that a different outcome would have resulted without the error." *People v Lukity*, 460 Mich 484, 495; 596 NW2d 607 (1999). "[I]n making this determination, this Court . . . focus[es] on the nature of the error in light of the weight and strength of the untainted evidence." *People v Feezel*, 486 Mich 184, 192; 783 NW2d 67 (2010) (quotation marks and citation omitted).

In this case, as already discussed above, there was sufficient evidence for the jury to reasonably conclude beyond a reasonable doubt that Long committed these crimes. Moreover, evidence of the use of a gun was necessary to prove some of the charged crimes and was relevant to proving all of them. Therefore, because the charged crimes involved guns, the jurors would not have been shocked by seeing a photograph of Long in the presence of a gun. Additionally, the fact that Chapel—not Long—was holding the gun in the photograph arguably makes the photograph less prejudicial as it relates to Long. Moreover, based on the questioning of counsel, the jury was well aware that Detective-Sergeant Molnar was unable to specifically identify what type of gun was in the photograph and even acknowledged that the gun could have been fake. Therefore, even if we were to conclude that the photograph was erroneously admitted into evidence, Long would not be entitled to a new trial because it is not more probable than not that admission of the evidence undermined the reliability of the verdict. See *Lukity*, 460 Mich at 495.

## C. LONG'S STANDARD 4 BRIEF

In a pro se supplemental brief filed pursuant to Supreme Court Administrative Order No. 2004-6, Long raises additional issues challenging the effectiveness of defense counsel's assistance.

---

[7] "For an individual to assert standing to challenge a search, the individual must have had a legitimate expectation of privacy in the place or location searched, which expectation society recognizes as reasonable." *Mahdi*, 317 Mich App at 459 (quotation marks and citation omitted).

Long also argues that he was "actually innocent." We conclude that none of these arguments have merit.

## 1. ASSISTANCE OF COUNSEL

Long failed to raise an ineffective assistance of counsel claim in the trial court in connection with a motion for a new trial or in a proper motion for remand to the trial court for a *Ginther*[8] hearing. "Therefore, our review is for errors apparent on the record." See *People v Abcumby-Blair*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 347369); slip op at 8, lv pending. To demonstrate ineffective assistance of counsel,

> a defendant must show: (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and, (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. [*Id.* at ___; slip op at 8 (quotation marks and citations omitted).]

The effective assistance of counsel is presumed, and "[a] defendant must overcome a strong presumption that the assistance of his counsel was sound trial strategy[.]" *People v Rosa*, 322 Mich App 726, 741; 913 NW2d 392 (2018) (quotation marks and citation omitted). Long has the burden of establishing the factual predicate for his claim of ineffective assistance. *People v Putman*, 309 Mich App 240, 248; 870 NW2d 593 (2015).

### a. FAILURE TO PRESENT AN ALIBI DEFENSE

Long argues that he was denied the right to effective assistance of counsel because defense counsel failed to investigate and present an alibi defense. The failure to reasonably investigate a case can constitute ineffective assistance of counsel. *People v Grant*, 470 Mich 477, 493; 684 NW2d 686 (2004). When an ineffective-assistance claim is premised on an attorney's failure to call an alibi witness, the defendant must demonstrate that the witness would have provided favorable alibi testimony. *People v Pickens*, 446 Mich 298, 327; 521 NW2d 797 (1994).

In this case, Long argues that, if certain alibi witnesses had been called to testify at trial, he would have been "completely exonerated." In so arguing, however, Long has not presented any evidence or citation to the record to support that he informed defense counsel about the witnesses and that counsel nonetheless failed to investigate them. More significantly, Long has not provided any affidavits from the alleged witnesses demonstrating what testimony they would have provided if called to testify. Without an offer of proof supporting that defense counsel was informed about the witnesses or a demonstration of the testimony that those witnesses would have provided if called, there is no basis for concluding that defense counsel performed deficiently by failing to call the witnesses or that Long was prejudiced by the failure to call the witnesses. Consequently, we cannot conclude that counsel's performance was prejudicial. See *Pickens*, 446 Mich at 327 (holding that a defendant's failure to present evidence that "establish[es] that the alibi

---

[8] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

witness would have testified favorably at trial" prevented a determination that counsel's performance was prejudicial). Accordingly, this ineffective-assistance claim cannot succeed.

### b. FAILURE TO MOVE FOR SEVERANCE OF TRIALS

Long next argues that defense counsel was ineffective for failing to move for severance of his and Chapel's trials. "Under MCR 6.121(C), the trial court 'must sever the trial of defendants on related offenses on a showing that severance is necessary to avoid prejudice to substantial rights of the defendant.'" *People v Furline*, 505 Mich 16, 20; 949 NW2d 666 (2020). "A defendant's claim of prejudice must be substantiated through concrete facts." *Id*. at 21 (quotation marks and citation omitted). Additionally,

> severance may be warranted when [the] defendants' mutually exclusive or antagonistic defenses create a serious risk of prejudice. But . . . the defenses must be irreconcilable and create such great tension that a jury would have to believe one defendant at the expense of the other. Defenses are mutually exclusive . . . if the jury, in order to believe the core of the evidence offered on behalf of one defendant, must disbelieve the core of the evidence offered on behalf of the co-defendant. Prejudice requiring reversal occurs only when the competing defenses are so antagonistic at their cores that both cannot be believed. But incidental spillover prejudice, which is almost inevitable in a multi-defendant trial, does not suffice. [*Furline*, 505 Mich at 21 (quotation marks and citations omitted).]

Long asserts that severance was necessary to avoid prejudice because his alibi defense conflicted with Chapel's strategy of not presenting any evidence in his defense. However, Long did not present an alibi defense and, for the reasons already discussed, has failed to establish that defense counsel was ineffective for failing to present such a defense. Even if Long had presented an alibi defense, it is unclear how "the competing defenses [would have been] so antagonistic at their cores that both [could not] be believed." See *id*. Chapel, like Long, denied that he had any involvement in the crimes and argued that the prosecutor could not establish the identity of the perpetrators. In the event that Long had presented an alibi defense, Chapel likely would have benefitted because the prosecution relied on Chapel's alleged telephone communications with Long to support its case against Chapel. It simply would not have benefitted Chapel to interfere with Long's alibi defense. Because Long has failed to establish that there is a reasonable probability that a motion for severance of trial would have been granted if counsel had so moved, this claim of ineffective assistance of counsel must fail. See *People v Buie (On Remand)*, 298 Mich App 50, 66; 825 NW2d 361 (2012) (counsel is not ineffective for failing to make a futile motion).

### c. FAILURE TO MOVE FOR APPOINTMENT OF AN EXPERT WITNESS

Long next argues that defense counsel was ineffective for failing to move for the appointment of a defense expert who could testify about the analysis of cell-phone records and cell-site mapping. Long asserts that he required an expert to demonstrate that the location information provided by the cell-phone records in this case is imprecise. We fail to see how defense counsel's failure to obtain and call such an expert affected the outcome of trial.

At trial, Stan Brue testified as an expert in the forensic analysis of cell-phone records. Brue presented a chart depicting the phone calls between the phones associated with Chapel, Long, and Wright in the hours before and after the shootings. Brue also presented a map depicting the cellular sites and sectors utilized by the phone associated with Long on the evening of November 30, 2017. When explaining the significance of the cellular sites and sectors, Brue testified that the use of a certain sector indicated that the cell phone was either "within, or just outside of" the sector. The sites and sectors used by Long's phone in the periods before and after the shootings were consistent with use near the crime scene.

On cross-examination by Chapel's counsel, Brue acknowledged that cell-phone records do not reveal specifically where a phone is located. Brue also admitted that factors, such as the weather, could cause a phone's signal to move toward a different tower. After Chapel's counsel completed cross-examination of Brue, counsel for Long elicited testimony from Brue that he could not analyze who was utilizing the cell phones at issue in this case. Upon further questioning, Brue explained that the records that he analyzed did not show where a phone is located within a sector. Brue noted that he could not "say that that phone was on this street corner, on this porch, in this church, et cetera." Long's counsel then elicited Brue's agreement that cell-cite mapping "is not an exact science when it comes to pinpointing where people are." Importantly, Brue stated that "[i]t doesn't even approach that science."

Because defense counsel was able to effectively elicit testimony through cross-examination of Brue that cell-phone records are not able to precisely identify a user's location, Long has not demonstrated that an expert was necessary to establish that the location information provided by cell-site records is imprecise. Furthermore, as already discussed, the record is replete with evidence to support that Long committed the crimes at issue in this case. Accordingly, because Long has not demonstrated that counsel was ineffective for failing to obtain and call an expert witness, Long is not entitled to the relief that he seeks. See *Abcumby-Blair*, ___ Mich App at ___; slip op at 8.

### d. REQUEST FOR REMAND

Finally, Long alternatively requests that this Court remand this matter for a *Ginther* hearing. Because Long has not set forth any facts that would require development of a record to determine if defense counsel was ineffective, we deny Long's request. MCR 7.211(C)(1)(a).

### 2. ACTUAL INNOCENCE

Finally, Long's assertion of actual innocence is not an independent basis for appellate relief. This assertion is premised on Long's contention that his actual innocence would have been demonstrated if counsel had moved for a separate trial and presented the evidence discussed in the previous issues. As explained earlier, sufficient evidence established Long's identity as one of the perpetrators, and Long has not demonstrated that counsel was ineffective for failing to present an alibi defense, failing to request appointment of an expert witness, or failing to move for a separate trial. Therefore, Long's claim of actual innocence is unavailing.

## IV.  CONCLUSION

With respect to Docket No. 348244, we remand to the trial court for proceedings consistent with this opinion.  We do not retain jurisdiction.  With respect to Docket No. 349245, we affirm.

/s/ Jonathan Tukel
/s/ Kathleen Jansen
/s/ Thomas C. Cameron

# Court of Appeals, State of Michigan

## ORDER

People v Demetrius Chapel

Docket No.    348244

LC No.    18-004779-01-FC

Jonathan Tukel
Presiding Judge

Kathleen Jansen

Thomas C. Cameron
Judges

Pursuant to the opinion issued concurrently with this order, this case is REMANDED for further proceedings consistent with the opinion of this Court. We do not retain jurisdiction.

Proceedings on remand in this matter shall commence within 56 days of the Clerk's certification of this order, and the proceedings shall be given priority on remand until they are concluded. As stated in the accompanying opinion, we remand to the trial court for an evidentiary hearing concerning the circumstances surrounding the seizure of Demetrius Chapel's cell phone and the circumstances surrounding law enforcement's search of the phone in relation to the crimes at issue in this case. The trial court must decide whether the seizure of the phone and the search of the phone were lawful. If necessary, the trial court must also decide whether the exclusionary rule applies with respect to the cell-phone data and the cell-phone records associated with Chapel's phone. The proceedings on remand are limited to these issues.

The parties shall promptly file with this Court a copy of all papers filed on remand. Within seven days after entry, appellant shall file with this Court copies of all orders entered on remand.

The transcript of all proceedings on remand shall be prepared and filed within 21 days after completion of the proceedings.

/s/ Jonathan Tukel
Presiding Judge

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

April 8, 2021
Date

Chief Clerk